UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Docket No. 2:16-cr-00036-NT |
| ) | |
| THEODORE SEALY, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

**ORDER ON MOTION FOR COMPASSIONATE RELEASE**

Before me is Defendant Theodore Sealy's motion for compassionate release ("**Def.'s Mot.**") (ECF No. 187), which the Government opposes ("**Gov't's Opp'n**") (ECF No. 192). For the reasons stated below, the Defendant's motion is **DENIED**.

**PROCEDURAL BACKGROUND**

On August 3, 2016, Mr. Sealy pleaded guilty to Count One of the Superseding Indictment, conspiracy to distribute and possess with the intent to distribute cocaine base, oxycodone, and heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Superseding Indictment (ECF No. 55); Minute Entry (ECF No. 70). On March 6, 2017, I sentenced him to eighty-four months imprisonment, followed by five years of supervised release. Judgment (ECF No. 159).

Mr. Sealy served the first half of his sentence in prison before being moved by the Bureau of Prisons ("**BOP**") to home confinement on October 28, 2020, due to his medical conditions and the increased risk of COVID-19 in an institutional setting. Def.'s Mot. 1. He now seeks to have his sentence reduced and to be released from home confinement.

## ANALYSIS

Congress enacted the compassionate release statute[1] to allow district courts to modify sentences of imprisonment, as relevant here, upon finding that: (1) extraordinary and compelling reasons warrant modification, (2) the modification accords with the § 3553(a) sentencing factors, and (3) the modification is consistent with "applicable policy statements" of the Sentencing Guidelines. I begin with the question of whether there exist extraordinary and compelling reasons warranting Mr. Sealy's release.

The compassionate release statute itself does not define what constitutes an "extraordinary and compelling reason[ ]" justifying a sentence modification. *United States v. Canales-Ramos*, 19 F.4th 561, 566 (1st Cir. 2021); *see* 18 U.S.C. § 3582(c). However, the United States Sentencing Commission has done so in the Commentary

---

[1] Title 18, United States Code, Section 3582(c)(1)(A) governs "[m]odification of an imposed term of imprisonment." Prior to the passage of the First Step Act of 2018, only the Director of the Bureau of Prisons ("**BOP**") could move for modification of a sentence. *See United States v. Brooker*, 976 F.3d 228, 231 (2d Cir. 2020). In December of 2018, Congress amended § 3582(c) to allow inmates to seek a modification of an imposed term of imprisonment from the courts directly. *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239 (codified at 18 U.S.C. § 3582(c)(1)(A)). Section 3582 now provides that:

> The court may not modify a term of imprisonment once it has been imposed except that—(1) in any case—(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—(i) extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).

to its policy statement on compassionate release, located at § 1B1.13 of the sentencing guidelines. In discussing medical-based reasons, the Commission notes that extraordinary and compelling reasons exist where:

> (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is —
>
> > (I) suffering from a serious physical or medical condition,
> > (II) suffering from a serious functional or cognitive impairment, or
> > (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> ….

*Id.* § 1B1.13 Commentary n.1. The Commentary addresses age-based and family-based reasons in subdivisions (B) and (C), and then provides in subdivision (D): "**Other Reasons.**—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.*

The Defendant does not argue that subdivision (A), (B), or (C) applies, instead arguing that he has "other" extraordinary and compelling reasons that warrant the application of subdivision (D). By its terms, subdivision (D) only allows the Director

3

of the BOP to consider whether "other" extraordinary and compelling reasons exist. However, this limitation predates Congress's enactment of the First Step Act, which granted incarcerated individuals the right to file motions for compassionate release in the event that the BOP declined or delayed doing so.[2] *United States v. Saccoccia*, 10 F.4th 1, 3–4, 7 (1st Cir. 2021). Because the Sentencing Commission has lacked a quorum for the last several years, it has not yet had the opportunity to consider how the implementation of the First Step Act might affect its policy guidance in § 1B1.13. *Id.* at 7. The First Circuit has previously noted that, because § 1B1.13 is so outdated, an "overwhelming majority of the courts of appeals that have passed on the issue" have concluded that § 1B1.13's guidance is not currently binding. *Id.* at 8. And while the First Circuit has not yet decided the issue, *id.*, I have previously determined "that § 1B1.13 does not control where a compassionate release motion is filed" directly by a defendant, *United States v. Millette*, Docket No. 2:16-cr-00004-NT, 2020 WL 7502454, at *6 (Dec. 21, 2020 D. Me.). I have also decided that although it is not binding, § 1B1.13 "still provides helpful guidance on how to analyze compassionate release requests. *Id.*[3]

---

[2] In order to give the BOP the opportunity to act in the first instance, a defendant must first appeal to the Director of the BOP for release prior to filing a motion. 18 U.S.C. § 3582(c)(1)(A). The Government does not dispute that Mr. Sealy has done so and has thus satisfied this exhaustion requirement. Gov't's Obj. to Def.'s Mot. for Compassionate Release ("**Gov't's Opp'n**") 4 n.5 (ECF No. 192).

[3] Although I conducted this analysis in the context of whether a sentence reduction was consistent with applicable policy statements issued by the Sentencing Commission, I see no reason why my analysis should not apply equally to an evaluation of whether extraordinary and compelling reasons exist. The point remains that the Sentencing Commission has not yet had the ability to consider how compassionate release motions should be evaluated when they are filed by a defendant rather than by the BOP. As a result, I do not consider myself bound by the Sentencing Commission's policy statement with regard to any part of the compassionate release analysis.

The Defendant asserts that his need for proper and timely medical care, combined with his increased susceptibility to complications from a COVID-19 infection, constitutes an extraordinary and compelling reason justifying a reduction in his sentence. And because § 1B1.13 is not binding, I am free to consider whether this asserted reason is in fact "extraordinary and compelling."

To make this assessment, I consider the plain meaning of the words "extraordinary" and "compelling." *Canales-Ramos*, 19 F.4th at 566. A reason is "extraordinary" if it "is beyond the mine-run either in fact or in degree." *Id.* Meanwhile, a "compelling" reason is one "that is both powerful and convincing." *Id.* at 567. The Defendant primarily relies on his medical conditions and need for treatment as a justification for his sentence reduction. "[B]ut not every complex of health concerns is sufficient to warrant compassionate release. This remains true even in the midst of the COVID-19 pandemic." *Saccoccia*, 10 F.4th at 5. It is only if "the defendant's situation constitutes the type of 'extreme hardship' that the compassionate-release statute is designed to ameliorate" that a sentence reduction is warranted. *Id.* at 4.

The Defendant's request for relief relies on three premises: 1) he has a number of serious medical conditions, 2) he has been unable to treat fully those medical conditions while on home confinement, and 3) he is at significantly higher risk of illness or death from COVID-19 because of his health conditions and because he is unvaccinated. The Government does not challenge the first point. Indeed, it seems that the Defendant's various medical conditions are the reason why he was released

5

from BOP custody to home confinement in October 2020. Def.'s Mot. 1, 20–21; Gov't's Opp'n 4 n.5. I also assume that the third premise is true.[4] But, as he appears to acknowledge, because Mr. Sealy is on home confinement, it is not enough for him to argue that he has serious medical conditions and is at heightened risk of an adverse outcome were he to contract COVID-19. The Defendant emphasizes that various district courts across the country have reduced a number of defendants' sentences in order to mitigate the risks of the spread of COVID-19 in the prison environment. Def.'s Mot. 18–19 (citing cases). But that risk is not present here. Mr. Sealy is already at home. He is not in a carceral environment where he would be unable to mitigate his risk of infection. And while he emphasizes that the BOP already found extraordinary and compelling reasons for his release from *prison*, Def.'s Mot. 20, he fails to acknowledge that those reasons do not necessarily justify a release from home confinement, which does not carry the same health risks as a carceral sentence.[5]

---

[4] The Government criticizes Mr. Sealy's unvaccinated status and points out that he initially provided no explanation for why he is not vaccinated and that he should not be rewarded for failing to take this significant step to mitigate his risk. Gov't's Opp'n 5. In response, the Defendant says that his doctors have advised him not to get vaccinated until they determine what autoimmune disease he is suffering from. Def.'s Reply 5 (ECF No. 194). I am skeptical about this explanation. The Defendant never asserts that he intends to get vaccinated, nor does he support his contentions with any medical authorities—whether from his doctors or from some other source—that someone with an autoimmune disease (even if undetermined) should not get vaccinated. But in any event, because Mr. Sealy is not currently incarcerated, I do not see the relevance of his risk of severe consequences from COVID-19.

[5] Nor am I persuaded by the idea that Mr. Sealy might be forced to return to prison. In support of this concern, he cites to a New York Times article from July 2021. Def.'s Mot. 11–12. The information on which he relies is not only outdated, *see* Katie Benner, Zolan Kanno-Youngs & Charlie Savage, *Some Inmates Can Stay Confined at Home After Covid Emergency, Justice Dept. Says*, N.Y. Times (Dec. 21, 2021), https://www.nytimes.com/2021/12/21/us/politics/prison-covid-home-confinement.html, but, as the Government points out, this concern is a speculative one. The Defendant has pointed to no evidence that *he* might be ordered to return to prison, and on the off-chance he were, he could seek relief from this Court at that point in time.

What the Defendant's motion boils down to is that he says he is not able to adequately treat his medical conditions while on home confinement because of the strictures of supervision that that punishment entails. Def.'s Mot. 1–3; First Decl. of Theodore Sealy ("**First Sealy Decl.**") 1–2 (ECF No. 187-1). Specifically, Mr. Sealy identifies two ways in which he says his supervision on home confinement interferes with his ability to treat his medical conditions. The first is the requirement that he receive advance approval for medical appointments and procedures, which he says does not allow him to be put on wait lists for specialist appointments and procedures. First Sealy Decl. 1. Mr. Sealy emphasizes that medical specialists tend to be booked months in advance and that canceled appointments sometimes allow for speedier care. First Sealy Decl. 1. He also describes how follow-up appointments must sometimes be scheduled on short notice (e.g., a biopsy that he was trying to schedule in December 2020). Def.'s Reply 4 (ECF No. 194). However, Mr. Sealy says he has been told by his supervision officers that BOP approval for medical procedures and appointments takes at least one week. First Sealy Decl. 1. As a result, he has been unable to schedule appointments on short notice, which has delayed the diagnosis and treatment of his ongoing health issues. First Sealy Decl. 1–2. The second purported issue that Mr. Sealy identifies is one he relays through an anecdote about an earlier trip to the emergency room, where his supervision officer required him to call an ambulance rather than let his wife drive him. First Sealy Decl. 1. The problem that arose there was that that ambulance took him to an out-of-network hospital

where his treatment was not fully covered by his health insurance. First Sealy Decl. 1.

While the first issue merits discussion, I dismiss the second out of hand. It is neither extraordinary nor compelling that a collateral consequence of home confinement is that Mr. Sealy cannot choose which hospital he is treated at in an emergency and that he might have to be treated at a hospital that does not accept his insurance.

As to the issue with scheduling appointments, this is a serious concern. It may be that in some cases an inability to schedule important medical appointments could be an extraordinary and compelling reason warranting a sentencing modification. But there is no such extraordinary and compelling reason in this case because Mr. Sealy's contentions are not supported by the facts.

In his initial motion, Mr. Sealy did not support his assertions about his inability to promptly schedule medical treatment with anything beyond his own statements.[6] But he surmised that his supervising officer, Jessica Ortiz, "would be happy to confirm" what he was saying. First Sealy Decl. 2.

That has proven to be incorrect. The Government has provided an email from Ms. Ortiz in which she outlines the procedure for last-minute requests for medical

---

[6] Although he attached medical records to his motion, he did not identify any aspect of these records supporting his contention that he was unable to schedule medical appointments on short notice—only that his medical appointments *were not* scheduled on short notice (without any apparent reason). These medical records are also entirely unhelpful. They are 416 pages, and the Defendant points to no page or pages as being particularly important. They are not in chronological order. And, as the Government points out, almost all of them appear to be from when Mr. Sealy was incarcerated rather than relating to recent treatment. Gov't's Opp'n 7 n.6.

appointments. According to Ms. Ortiz, when Mr. Sealy requests a medical appointment, she must submit the request through a BOP computer system. Email from Jessica Ortiz ("**Ortiz Email**") (ECF No. 193). When she does so, she has the option to mark a request as urgent if the request is for a last-minute (even same day) appointment. Ortiz Email. Ms. Ortiz notes that urgent requests are reviewed as soon as possible, and she can also contact her supervisor to escalate the review of such a request. Ortiz Email. Ms. Ortiz also states that she is unaware of any resident ever having been denied the ability to attend a medical appointment or of any appointment request failing to be processed. Ortiz Email.

In response, Mr. Sealy contends that this policy was never communicated to him and that he was previously told that he had to submit requests for appointments a week in advance. Def.'s Reply 4–5. He also states that he specifically asked to schedule a next-day biopsy in December 2020 and was told that that was not permitted. Def.'s Reply 4. In addition to his own attestations, Mr. Sealy points to the rules of supervision that he was given, which request that medical appointments be scheduled a week in advance and that medical procedures be scheduled two weeks in advance. Rules of Supervision 3–4 (ECF No. 194-3).

I recognize that the rules of supervision that Mr. Sealy points to say that medical appointments should be scheduled a week in advance and that medical procedures should be scheduled two weeks in advance. But it sounds from these rules like it is *requested* that appointments and procedures be scheduled within this time

9

frame, not that they are *required* to be. Nor do these rules say anything about urgent appointments and whether the rules might be different for such appointments.

It may be the case that the procedure for scheduling urgent appointments was not previously communicated to Mr. Sealy. And it may be the case that there were earlier miscommunications about scheduling such appointments that prevented Mr. Sealy from being able to schedule some medical appointments in the past. But I do not see how these earlier mishaps could constitute an extraordinary and compelling reason justifying his release from home confinement. It makes sense that Mr. Sealy might need to be released from home confinement if it were necessary to accommodate his future treatment. But it does not make sense that he would need to be released in order to rectify what may have been earlier mistakes involving his supervision.

Regardless of what was communicated to Mr. Sealy in the past, it should be very clear to him now not only that he is able to schedule last-minute appointments, but what the procedure is for doing so. And to the extent that Mr. Sealy has future difficulties scheduling such appointments, he now has written statements from the Government telling him that not only is it permissible to schedule last-minute appointments, but his supervising officer is unaware of any inmate being unsuccessful in scheduling one. Given all of this, Mr. Sealy's basis for his motion (that he is unable to schedule last-minute appointments) not only does not appear to be extraordinary or compelling, but it appears to be illusory. As a result, because it appears that Mr. Sealy should be able to work with his supervising officer to schedule

any necessary medical treatment in the future, he has not established an extraordinary and compelling reason justifying his release from home confinement.

## CONCLUSION

For the foregoing reasons, the Defendant's motion for compassionate release is **DENIED**.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated: February 8, 2022